UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

WALTER RUCKER                          CIVIL ACTION

VERSUS                                 NO: 10-3308

LIFE INSURANCE COMPANY OF              SECTION: J(4)
NORTH AMERICA

<u>**ORDER AND REASONS**</u>

Before the Court are Plaintiff Walter S. Rucker's **Motion for Judgment on the Administrative Record (Rec. Doc. 14)**, Defendant Life Insurance Company of North America's **Memorandum in Opposition (Rec. Doc. 17)**, and Plaintiff's **Reply Memorandum (Rec. Doc. 21)**.  This matter is before the Court for a trial on the briefs and the administrative record.  Having reviewed the parties' trial briefs, the administrative record, and the law, the Court hereby **GRANTS** Plaintiff's Motion for Judgment on the Administrative Record, for the reasons stated below.

**PROCEDURAL HISTORY AND BACKGROUND FACTS**

Plaintiff Walter S. Rucker joined Loyola University's faculty in 1981, where he worked as an Associate Ceramics Professor for approximately 18 years.  Loyola University provided its employees long-term disability insurance under a group disability plan

1

insured and administered by Defendant Life Insurance Company of
North America ("LINA").

Beginning sometime in 2004-2005, Plaintiff began
experiencing lower back pain.  At the onset of his symptoms, his
pain was reportedly manageable, and so Plaintiff continued to
teach his ceramics classes.  As his pain worsened, however,
Plaintiff sought medical treatment and informed the University
that his condition was interfering with his ability to teach.  In
the fall semester of 2009, Loyola offered an assistant to help
assist Plaintiff with the manual labor required to perform his
job, as well as to oversee some of his teaching duties when
Plaintiff was unable to do so.  Even with assistance, however, it
soon became apparent that continued attempts to perform his job
were simply untenable.  Accordingly, Plaintiff decided to
relinquish his position and file a claim for disability benefits
with his insurer.

On October 1, 2009, Plaintiff submitted his claim for long-
term disability benefits to LINA.  The claim listed his disabling
condition as "degenerative disc disease – chronic back pain."  In
support of his claim, Plaintiff included medical records from
consultations with Dr. Andrew Todd, an orthopedic specialist.
Dr. Todd's notes indicated that Plaintiff described his pain as a
5/10 to 6/10 in intensity, as well as reporting numbness in his

left leg and pain in his right leg.  Notes from Dr. Todd's physical examinations revealed that he had 5/5 power in both legs, with no loss of sensation, and full range of motion in his hips.  Dr. Todd indicated that Plaintiff had severely limited range of motion of his lumbar spine because of pain, that he appeared to be very uncomfortable during the entirety of the exam, and that he exhibited heightened discomfort going from a seated position to standing.

In order to confirm the results of his physical examinations, Dr. Todd reviewed a previous MRI and ordered a new series of diagnostic tests, including an MRI and discogram.  Dr. Todd noted that Plaintiff's 2007 MRI indicated L4-5, L5-S1 degenerative disc disease with disc dehydration, with no severe loss of disc height.  The results of a new MRI were largely consistent with the previous MRI, revealing mild annular bulge of the L4-L5 disc, and mild right paracentral disc protrusion at the L5-S1 and T11-T12 levels, resulting in thecal sac compression on predominantly the right side.  A discogram of Plaintiff's spine further confirmed a posterior and left-side tear of the annulus fibrosus at the L4-L5 level, with small disc herniation into the left neural foramina.  It also indicated mild to moderate spinal canal stenosis secondary to the disc protrusion and hypertrophy of the facets and ligamentum flavum.  At the L5-S1 level, the

discogram demonstrated a circumferential disc protrusion and tear of the annulus fibrosus.

Dr. Todd composed a letter summarizing his findings. Dr. Todd reported that Plaintiff had been diagnosed with degenerative disc disease, based on the results of his x-rays, MRI's, and discograms. Dr. Todd also explained that Plaintiff's discogram was non-concordant, which meant that he was unable to conclusively determine the particular discs generating Plaintiff's pain. As a result, he concluded that lumbar surgery was not a viable treatment option. He also noted that Plaintiff had great difficulty standing up from a seated position, standing for long periods of time, and tolerating physical therapy. Because of the strenuous nature of his job duties, Dr. Todd concluded that it was "impossible for [Plaintiff] to perform his job in the Ceramics Department."[1]

In addition to the above, Plaintiff also included physicians' statements from both Dr. Todd and Dr. Christopher Lege, his primary care physician, in support of his claim. Dr. Todd's statement listed a diagnosis of degenerative disc disease at the L-5 level. As to Plaintiff's back, Dr. Lege agreed with Dr. Todd's diagnosis, but also diagnosed Plaintiff with chronic

---

[1]   Rec. Doc. 11-4, A.R., p. 271-72.

obstructive pulmonary disease, or "COPD." Both physicians reported that Plaintiff's subjective symptoms were consistent with the results of the objective medical evidence reviewed. Each also indicated that Plaintiff was able to perform only sedentary work and could not return to work at his previous job.

### i. LINA's Initial Denial of Plaintiff's Claim

After receiving Plaintiff's claim, LINA submitted his file to a registered nurse case manager for review. The nurse case manager noted that there were no available sensory deficits or lower extremity strength scales provided to indicate the Plaintiff's functionality level, and that Plaintiff's MRI indicated no nerve root compression or impingement. Furthermore, because there were no records past August 7, 2009 to review, he indicated that there was insufficient medical documentation to support that Plaintiff was disabled throughout the 90-day benefit waiting period.

By letter dated December 3, 2009, LINA denied his claim for disability benefits, stating that the medical evidence presented in support of his claim did not support a finding that he was unable to perform his occupational duties. Should he wish to appeal the determination, LINA recommended that Plaintiff's physicians provide additional documentation to support his claim. LINA specifically noted that the following information could be

of assistance:

> (1) Copies of any other diagnostic test results (such as a CT Scan, EMG, Myelogram, x-ray, neurological exam, functional capacity evaluation, etc.) that document a sufficient degree of severity in your condition to render you unable to perform all the material duties of your regular occupation.  In the absence of this documentation, we shall assume any such reports revealed normal findings and unimpaired function.

> (2) Copies of treatment notes, hospital records, office notes, physical therapy notes and/or consultation reports for the period of September 1, 2009 through the present.

> (3) A discussion by your treating physician(s) of any medical evidence pointing to a condition that prevents you from performing all the material duties of your regular occupation.  What are the current data sources used to make this determination?

> (4) A discussion by your treating physician(s) describing your current and future treatment plan(s). What are the problems of treatment?  What are the treatment goals (objective and measurable)?  What are the treatment strategies for each goal?  How does the treatment plan address your return to work?[2]

On December 17, 2009, LINA received additional medical records from Dr. Lege regarding Plaintiff's visits from June 19 through September 4, 2009.  LINA reviewed this additional information and determined that it presented no new information which would change its previous determination.  LINA sent a letter to this effect to Plaintiff on December 23, 2009.

---

[2]  Rec. Doc. 11-2, A.R., p. 130.

### ii.  Plaintiff's Appeal of LINA's Determination

Plaintiff appealed LINA's denial of benefits in a letter dated April 20, 2010.  In an effort to provide the additional documentation LINA requested, Plaintiff sought and obtained an additional opinion from Dr. Charles Billings, an orthopedic surgeon at Tulane University Hospital.  Dr. Billings performed a physical examination and ordered additional x-rays, blood work, a nuclear full-bone scan, a lumbar myelogram, and a CT scan, in accordance with the additional tests that LINA had requested.

The lumbar myelogram revealed broad-based disc protrusion or herniation at L5-S1, as well as multifactorial left-sided neural foraminal stenosis at L4-L5.  Dr. Daniel Rovira, who interpreted the results of the myelogram, noted that these results correlated with the CT discogram performed in July of 2009, as well as the MRI of Plaintiff's spine performed in June 2009.  The results of the nuclear whole-body bone scan were also consistent with the previous discogram and MRI, as well.

Based on these results, Dr. Billings submitted a physician statement dated April 15, 2010, in which he listed a diagnosis of degenerative disc disease.  He also reported physical limitations largely consistent with those indicated by Dr. Todd and Dr. Lege, allowing only sedentary work.  He expressed uncertainty as to whether Plaintiff would be able to return to work, and that he

7

would recommend further testing to determine whether surgery is a viable treatment option.

Plaintiff also obtained an additional letter from Dr. Todd. In his letter, Dr. Todd expressed confusion about LINA's requests for further documentation, as he felt that all the information that LINA was requesting had been previously provided in support of Plaintiff's initial claim.  Nonetheless, in light of the physically strenuous demands of his job duties, he reiterated his position that Plaintiff was unable to perform these duties in light of the debilitating pain caused by his spinal condition.

After receiving notice of Plaintiff's appeal, LINA forwarded the additional materials submitted, along with the original case file, to another nurse case manager for review.  After reviewing the additional evidence provided, the case manager determined that the new information did not change LINA's prior determination.   In order to gain further clarification, LINA also submitted Plaintiff's claim file to Dr. Richard Ursone, a Board Certified Orthopedic Surgeon, with instructions to review whether the restrictions and limitations reported by Plaintiff's treating physicians were supported by the medical evidence in his file.

Dr. Ursone described the specific restrictions reported by Dr. Billings, Dr. Lege, and Dr. Todd, and having reviewed their

8

reports and the associated documentation, he concluded that these
restrictions were unsupported by the medical evidence.  With
little other explanation, Dr. Ursone stated that Plaintiff's
physical examinations remained unchanged over the course of
multiple visits, that the only finding made by Plaintiff's
treating physicians was Plaintiff's restrictive range of motion
resulting from his pain, and that there were "no other measured
limitations" to support the various restrictions and limitations
reported by each of Plaintiff's physicians.

On June 2, 2010, LINA informed Plaintiff that it would
uphold its previous denial of benefits, again reiterating its
position that no objective medical evidence had been submitted to
substantiate his inability to perform the material duties of his
occupation.  The letter concluded:

> **"In summary, clinical evidence has not been provided
> documenting the presence of exam findings to
> substantiate a significant functional impairment that
> would prevent you from performing the material duties
> of your regular occupation.  A condition, diagnosis, or
> treatment does not automatically deem [sic] a disabling
> condition or a decreased level of functionality.
> Although you are reporting pain, this does not equate
> to a functional impairment without documentation of
> physical exam findings or other clinical abnormalities
> to support a functional deficit.  Consequently, we are
> affirming the previous denial decision."[3]**

Having exhausted all administrative appeals, Plaintiff filed

---

[3]  Rec. Doc. 11-2, A.R. p. 136-38.

this suit in federal court, challenging LINA's denial of benefits under the terms of the policy and seeking attorney's fees, costs, and legal interest.

### THE PARTIES' ARGUMENTS

Plaintiff argues that LINA's determination that he is not entitled to long-term disability benefits was arbitrary and capricious for several reasons, in light of the evidence presented.  He first submits that he has clearly demonstrated that he is disabled under the terms of the policy by providing the opinions of his treating physicians, each stating that he is unable to stand, lift more than 10 pounds, stoop or bend over, or sit for extended periods of time.  He points out that these conclusions were based upon physical examinations by his treating physicians, as well as a variety of objective medical diagnostic tests, such as MRI's, myelograms, full bone scans, and discograms.  Plaintiff charges that LINA essentially chose to ignore this substantial evidence in deciding to deny his appeal. Instead, Plaintiff argues that LINA chose to blindly rely on the opinions of its own nurse case managers, as well as the report of a non-examining peer physician, in making its determination. Accordingly, he argues that LINA's determination was not based upon "substantial evidence" contained in the administrative record.

Second, and relatedly, Plaintiff argues that LINA failed to undertake any analysis of Plaintiff's actual ability to perform the duties of his job in its determination that he does not qualify as disabled.  He argues that neither LINA's nurse case managers nor Dr. Ursone conducted an analysis of his ability to perform the material duties of his regular occupation in light of the medical evidence he presented, and points out that Dr. Ursone was never even provided with a copy of his job duties.  Plaintiff also adds that the arbitrary nature of LINA's determination is evidenced by the fact that the Social Security Administration has declared Plaintiff to be completely disabled.

Next, Plaintiff argues that LINA abused its discretion by failing to consider the list of Plaintiff's regular employment duties supplied by his employer and instead relying exclusively on the list of duties supplied by the Department of Labor's Dictionary of Occupational Titles ("the DOT").  Plaintiff argues that the list of duties supplied by the DOT is considerably less strenuous than the actual duties he performed, as shown by the staff job description supplied by his employer.

Finally, Plaintiff submits that LINA's determination was also arbitrary and capricious because it ignored that he had been diagnosed with COPD.  He notes that this diagnosed condition was referenced in the evidence submitted in support of his claim,

substantiated by medical evidence from his treating physicians, and even discussed with the LINA claims adjuster.  In light of the above, he argues that it was arbitrary and capricious for LINA to largely ignore the effect of such in making its determination that he was not entitled to benefits under the terms of the plan.

In response, LINA argues that its decision to deny Plaintiff's claim for long-term disability benefits was justified because Plaintiff failed to produce objective medical evidence supporting his claim that he could not perform the material duties of an Associate Ceramics Professor.  While multiple physicians have diagnosed Plaintiff with degenerative disc disease, LINA argues that the mere fact that Plaintiff has been diagnosed with a condition that *may* result in disability does not necessarily result in the conclusion that Plaintiff *is*, in fact, disabled.  It argues that the proof of disability Plaintiff offered – i.e., the subjective opinions of his treating physicians that his pain renders him unable to perform his job – are based solely on Plaintiff's subjective reports of pain – and not objective evidence demonstrating his inability to perform his job functions.  In short, while Plaintiff's treating physicians may be required to accept his subjective complaints of pain as true, as the claims administrator, LINA argues it was not.

12

LINA also stresses the fact that it submitted all of the evidence in Plaintiff's case file to several nurse case managers, as well as to another Board Certified Orthopedic Surgeon, and that each of these individuals independently concluded that the medical evidence failed to justify the restrictions recommended by Plaintiff's treating physicians.  Consequently, LINA contends that its determination that Plaintiff was not entitled to disability benefits was legally correct, and in any event, not arbitrary and capricious.

Next, LINA contends that it was not arbitrary and capricious for it to determine Plaintiff's job duties with reference to his position in the general economy.  To the contrary, it argues that numerous courts, including the Fifth Circuit, have adopted a broad interpretation of the "own occupation" standard for disability policies.  Furthermore, even if there are differences between the DOT description on which it relied and Plaintiff's actual job duties, LINA submits that these differences are insignificant and insufficient to allow the Court to find that LINA abused its discretion.

Finally, LINA argues that Plaintiff's claims that COPD prevents him from performing his job are not ripe for determination by this Court.  Specifically, it points out that Plaintiff listed his disabling condition as only "degenerative

disc disease – chronic back pain" in his application for long-term disability benefits, and did not list COPD as a disabling condition.  Consequently, LINA argues that he has not exhausted his administrative remedies before filing suit seeking benefits as a result of this condition.  In any case, it argues that the Administrative Record contains no objective medical evidence substantiating that Plaintiff's COPD prevented him from performing the material duties of his occupation.

### LEGAL STANDARD

The Employee Retirement Income Security Act of 1974 ("ERISA") provides federal courts with jurisdiction to review determinations made under employee benefit plans. 29 U.S.C. § 1132(a)(1)(B).  It is undisputed that the plan at issue in the instant case is governed by ERISA. Generally, when a denial of benefits is challenged under § 1132(a)(1)(B), the district court's role is to review the decision *de novo*.  Firestone Tire and Rubber Co., v. Bruch, 489 U.S. 101, 115 (1989).  However, where a benefit plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, as the policy does here,[4] the district

---

[4]  See Rec. Doc. 11-2, A.R., p. 98 ("For plans subject to the Employee Retirement Income Security Act (ERISA), the Plan Administrator of the Employer's employee welfare benefit plan (the Plan) has appointed the Insurance Company as the Plan

14

court's role is to determine whether the administrator abused its discretion in denying the claim.  Holland v. Int'l Paper Co. Retirement Plan, 576 F.3d 240, 246 (5th Cir. 2009).

In Ellis v. Liberty Life Assurance Co. of Boston, 394 F.3d 262, 269-70 (5th Cir. 2004), the Fifth Circuit outlined the two-step process for reviewing an administrator's interpretation and application of an ERISA plan for abuse of discretion.  First, a court must determine whether the administrator's determination was legally correct.  If it was, then no abuse of discretion is possible, and the inquiry ends.  Id. at 270.  If the administrator's determination was *not* legally correct, however, then the court must review whether the decision was an abuse of discretion.  Id.  However, a court is not ultimately required to confine itself to this two-step analysis.  The first step may be bypassed if the Court can more readily determine whether the administrator has abused its discretion.  See Holland, 576 F.3d at 246 n.2.

---

Fiduciary under federal law for the review of claims for benefits provided by this Policy and for deciding appeals of denied claims. In this role the Insurance Company shall have the authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact. All decisions made by the Insurance Company in this capacity shall be final and binding on Participants and Beneficiaries of The Plan to the full extent permitted by law.").

Under the abuse of discretion standard, the court must determine whether the administrator's determination was arbitrary and capricious. Anderson v. Cytec Indus., Inc., 619 F.3d 505, 512 (5th Cir. 2010). A decision is arbitrary only if made without a rational connection between the known facts and the decision or between the found facts and the evidence. Holland, 576 F.3d at 246; see also Lain v. UNUM Life Ins. Co., 279 F.3d 337, 342 (5th Cir. 2002) ("A plan administrator abuses its discretion where the decision is not based on evidence, even if disputable, that clearly supports the basis for its denial.").

Additionally, the plan administrator's decision to deny benefits must be supported by substantial evidence. Ellis, 394 F.3d at 273. Substantial evidence "is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Corry v. Liberty Life Assurance Co. of Boston, 499 F.3d 389, 398 (5th Cir. 2007). Ultimately, the court's "review of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness-even if on the low end." Id. (quoting Vega v. Nat'l Life Ins. Servs., Inc., 188 F.3d 287, 297 (5th Cir. 1999)).

Finally, when the same entity that maintains discretionary

16

control over disability determinations is also the entity that must pay any disability benefits, a court must account for this structural conflict of interest.  In these circumstances, courts employ a "sliding scale" standard of review, under which less deference is given to the administrator's determination in proportion to the evidence of conflict.  Ellis, 394 F.3d at 269-70.  In short, the standard of review remains abuse of discretion, but the existence of a conflict of interest is a factor that should be considered in determining whether the administrator abused its discretion.  Here, the parties do not dispute that a conflict of interest exists, as LINA acts as both insurer and administrator of the employee disability plan at issue.  However, because Plaintiff has introduced no additional evidence other than to point out the existence of this structural conflict, the Court will review LINA's decision with "only a modicum less deference" than it otherwise would.  Vega, 188 F.3d at 301.

### DISCUSSION

**A. The LINA Policy**

The LINA policy at issue in this case contains two definitions of disability:  an "own occupation" definition and an "any occupation" definition. Under the "own occupation" standard, an individual will be considered disabled if "because of Injury

17

or Sickness ... he or she is unable to perform all material duties of his or her regular occupation, or solely due to Injury or Sickness, he or she is unable to earn more than 80% of his or her Indexed Covered Earnings."[5]

Once disability benefits have been payable for 24 months, the insured is considered disabled only if he meets the "any occupation" definition.  Under this standard, an insured is disabled if "after Disability Benefits have been payable for 24 months, he or she is unable to perform the material duties of any occupation for which he or she may reasonably become qualified based on education, training or experience which provides him or her with substantially the same earning capacity as his or her former earning capacity prior to the start of his or her disability."[6]

Plaintiff's last day of work for Loyola University was on September 24, 2009, after which he claims to have become disabled under the terms of the policy.[7]  Because the policy provides for a 90-day benefits waiting period, Plaintiff did not become eligible to receive long-term disability benefits until December

----

[5]  Rec. Doc. 11-1, A.R., p. 77.

[6]  Rec. Doc. 11-1, A.R., p. 77.

[7]  Rec. Doc. 11-1, A.R., p. 58.

18

24, 2009.[8]  Thus, the 24-month "own occupation" period for Plaintiff's claims ran through December 24, 2011.

Because LINA denied Plaintiff's claims during the "own occupation" period, it did not make a determination as to whether Plaintiff would be entitled to benefits under the more stringent "any occupation" standard.  LINA must first be afforded the opportunity to make this initial determination before such a claim can be reviewed by the Court.  See Pakovich v. Broadspire Services, Inc., 535 F.3d 601, 605-06 (7th Cir. 2008) (holding that when an ERISA plan administrator denies benefits under an "own occupation" standard, but makes no determination under the "any occupation" standard, the matter must be sent back to the plan administrator to address the issue in the first instance); Bray v. Fort Dearborn Life Ins. Co., 312 F. App'x. 714, 716 (5th Cir. 2009) (holding that district court did not err in remanding plaintiff's claim for "any occupation" disability benefits to plan administrator for initial determination, after finding the plan administrator's decision under "own occupation" standard arbitrary and capricious).  As a result, the only benefits currently at issue in this case are those payable under the 24-month "own occupation" period.

---

[8]  Rec. Doc. 11-1, A.R., p. 58.

**B.   The "Material Duties" of Plaintiff's "Regular Occupation"**

Plaintiff first challenges whether LINA improperly interpreted the terms "material duties" and "regular occupation" by referring to the job duties provided by the DOT, as opposed to Plaintiff's *actual* job duties as supplied by his employer.  LINA responds that, because the term "regular occupation" is undefined in the policy, it had discretion to interpret the term, so long as its interpretation is reasonable.  It argues that it was not only reasonable, but legally correct to consult the job duties provided by the DOT's classification of his occupation.

Here, the policy leaves the terms "material duties" and "regular occupation" undefined.  These terms can be interpreted in two ways.  First, the duties of a person's "regular occupation" could refer to the job duties performed by a specific claimant for his specific employer – i.e., a "specific" approach.  Alternatively, the phrase can be understood to refer to the duties commonly performed by individuals holding the same general occupation in the national economy – i.e., a "general" approach.

There is authority for both interpretations in the federal circuit courts of appeals.  Compare Gallagher v. Reliance Standard Life Ins. Co., 305 F.3d 264, 272-73 (4th Cir. 2002) (holding that reference to the DOT for material duties of

20

plaintiff's position was proper when the term "occupation" was undefined in the policy and there was no significant difference between the duties listed by the DOT and plaintiff's actual duties); Darvell v. Life Ins. Co. of N. Am., 597 F.3d 929, 936 (8th Cir. 2010) ("The phrase 'material duties of his . . . regular occupation' can be interpreted to refer to [the claimant's] generic occupation, rather than his specific position."); Osborne v. Hartford Life and Accident Ins. Co., 465 F.3d 296, 299 (6th Cir. 2007) ("We agree with the district court that Hartford's use of the [DOT] to determine Osborne's 'own occupation' was not arbitrary and capricious, but on the contrary was 'reasonable.' The word 'occupation' is sufficiently general and flexible to justify determining a particular employee's 'occupation' in light of the position descriptions in the [DOT] rather than examining in detail the specific duties the employee performed.") with Caldwell v. Life Ins. Co. of N. Am., 287 F.3d 1276, 1283 (10th Cir. 2002) (holding that "the relevant LINA standard for 'own occupation' disability is whether [the insured] was capable of performing his *own* job with his employer at the time he was terminated")(emphasis in original); Lasser v. Reliance Standard Life Ins. Co., 344 F.3d 381, 385-86 (3d Cir. 2003) ("Both the purpose of disability insurance and the modifier 'his/her' before 'regular occupation' make clear that 'regular

21

occupation' is the usual work that the insured is actually performing immediately before the onset of disability.").

The Fifth Circuit has apparently sided with the "general" approach for determining the duties of an occupation under the "own occupation" standard.  See Robinson v. Aetna Life Ins. Co., 443 F.3d 389, 396 (5th Cir. 2006) (explaining that the correct interpretation of the "own occupation" standard is the occupation in the general economy, as opposed to a specific job for a specific employer); see also House v. Am. United Life Ins. Co., 499 F.3d 443, 453-54 (5th Cir. 2007) (finding that plaintiff's "regular occupation" was that of an attorney with duties as they are found in the general economy, "not restricted to his own specific job as a litigation attorney with a uniquely stressful practice").

Nonetheless, even under this "general" formulation of the own occupation standard, evidence of a claimant's specific job duties is not irrelevant.  See Robinson, 443 F.3d at 396 (rejecting insurer's argument that evidence of claimant's specific job duties are irrelevant under general interpretation of the "own occupation" standard); see also Burch v. Hartford Life and Acc. Ins. Co., 314 F. App'x. 750, 755 (5th Cir. 2009) (noting that "while the correct standard is the occupation in the general economy and not the specific job for a specific employer,

the specific duties of the employee's job, as described by the employer, are relevant").

To the contrary, as both the Fifth Circuit and other courts have recognized, the specific duties of the employee's job, as provided by the employer, serve to *illustrate* the material duties of an individual in the same occupation in the general economy. See, e.g., Robinson, 443 F.3d at 396 ("Robinson's duties at Glazer serve to illustrate the duties that a sales representative at a comparable firm might perform."); Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d 243, 253 (2d Cir. 1999)("Though her precise duties do not define her regular occupation, in this case they well illustrate the duties of a director of nursing at a small health care facility, and nothing in the record provides any basis for thinking that such a position at a facility comparable to hers requires [different duties].").

As such, an insurer's exclusive reliance on the DOT to define the material duties of a claimant's occupation may nonetheless be arbitrary and capricious if the plaintiff offers evidence that the job he was actually performing does not comport with the DOT description selected.  See, e.g., Gilchrest v. Unum Life Ins. Co. of Am., 255 F. App'x 38, 43-44 (6th Cir. 2007) (finding an insurer's termination of benefits arbitrary and capricious where evidence established that the material duties of

plaintiff's regular occupation were materially different and more physically demanding than the DOT description upon which administrator relied); <u>Bowers v. Hartford</u>, No. 09-290, 2010 WL 1963412, at *8 (S.D. Ohio May 17, 2010) (finding decision to be arbitrary and capricious in part due to use of generic "administrative assistant" DOT occupation without considering evidence that plaintiff had heavier lifting requirements); <u>Thomas v. Brunswick Corp</u>., No. 08-07, 2009 WL 274493, at *7 (E.D. Ky. Jan. 30, 2009) (holding that administrator's decision was arbitrary and capricious where it used a "light" strength DOT classification despite admitting that the plaintiff's actual occupation required "medium" strength levels).

In the instant case, LINA determined that the DOT did not contain a specific entry for Plaintiff's actual occupation, Associate Ceramics Professor.  Accordingly, LINA determined the essential functional requirements of Plaintiff's occupation by analogizing to two different DOT occupational listings:  one for an associate professor, and one for a clay thrower.  LINA determined that these two entries accurately reflected the material duties of Plaintiff's occupation, which it determined to be at a "medium" physical demand level "due to [his] need for

lifting and mixing supplies."[9]  Because the physical requirements
for the "thrower" position more closely aligned with Plaintiff's
job duties, LINA referred to this entry when analyzing
Plaintiff's claim.

Although it acknowledges that the DOT description for this
position may not be identical to Plaintiff's actual job duties,
LINA nonetheless argues that the two are at least comparable.
The Court disagrees.  A comparison of the DOT description to
Plaintiff's actual duties evinces significant differences.  The
DOT provides that a clay thrower "[m]olds plastic clay into such
ware as vases, urns, saggers, and pitchers, as clay revolves on
potter's wheel" and performs the following essential duties:

> **1. Positions ball of clay in center of potter's wheel
>    and starts motor, or pumps treadle with foot to
>    revolve wheel.**
>
> **2. Presses thumbs down into center of revolving clay to
>    form hollow.**
>
> **3. Presses on inside and outside of emerging clay
>    cylinder with hands and fingers, gradually raising
>    and shaping clay to desired form and size.**
>
> **4. Constantly adjusts speed of wheel to conform with
>    changing tenacity (firmness) of clay as piece
>    enlarges and walls become thinner, judging degrees
>    of change by feel.**
>
> **5. Smooths surfaces of finished piece, using rubber**

---

[9]  <u>See</u> Rec. Doc. 11-4, A.R., p. 254.

scrapers and wet sponge.

6. Verifies size and form, using calipers and templates.

7. Pulls wire held taut between both hands through base of article and wheel to separate finished piece, or removes piece from wheel to dry.[10]

Additionally, the DOT entry lists the following physical strength requirements for an individual employed as a thrower:

**Strength:  Medium**

Lifting, Carrying, Pushing, Pulling 20-50 lbs. occasionally, 10-25 lbs. frequently, or up to 10 lbs. constantly.

**Physical Demands:**

| | |
|---|---|
| **Climbing:** | **Never** |
| **Balancing:** | **Never** |
| **Stooping:** | **Never** |
| **Kneeling:** | **Never** |
| **Crouching:** | **Never** |
| **Crawling:** | **Never** |
| **Reaching:** | **Frequently** |
| **Handling:** | **Frequently** |
| **Fingering:** | **Frequently** |
| **Feeling:** | **Occasionally**[11] |

In contrast, the staff job description provided by Plaintiff's employer, which he submitted to LINA, lists the

---

[10]   See Rec. Doc. 11-4, A.R., p. 258.

[11]   See Rec. Doc. 11-4, A.R., p. 257-58.

following essential functions and physical requirements:

III. <u>DUTIES AND RESPONSIBILITIES</u>

A. <u>Essential Functions</u>

Teach 18 contact hours of studio ceramics per week:

Handbuilt Ceramic Form, 3 credits

Wheel Thrown Ceramic Form, 3 credits

Advanced Ceramic Form I, 3 credits

Advanced Ceramic Form II, 3 credits (the advanced course numbers meet at the same time twice weekly)

Maintain and supervise the studio areas for Ceramics instruction: main work room, kiln firing room, outside kilns firing areas, Bulk clay and glaze materials storage areas, Clay mixing room, Glaze mixing and application room.

Bulk clay and glaze materials are ordered one to two times per semester. Most bulk clays come in 50 lb. bags. They must be retrieved from delivery truck on Dominican St. and wheeled into Ceramics department, stacked in appropriate designated areas i.e. storage shelves, behind clay mixer, and materials storage closet.

Recycle all used and unused clay that does not become Ceramic art (fired). Supervise and mix all clays for ceramic classes. Each class will usually need one mixer (about 200 lbs.) of clay to be available every 10 days.

Maintain, repair all equipment and tools, lubricate pottery wheels, slab roller, clay mixer once per semester.

Maintain electric and gas kilns and kiln furniture (shelves and stacking posts). Kiln shelves vary in weight 10 to 20 lbs. approximately. Change electric

kiln elements when necessary.

Load and fire all student work. This becomes approx. 40 or more firings per semester, including loading each individual pot or sculptural work, stack on shelves and then remove each object after firing is complete. A general kiln firing is 3 days of attentive physical activity.

Mix small and large (5 gallons) batches of glazes safely. A glaze recipe will take approximately one hour to complete. Depending on the number of enrolled ceramic students, there are approximately 30 glazes or slips mixed per semester.

Teaching Wheel Thrown Ceramics requires constant bending over, getting up and down to assist each student. That results in about 80 or more points of assistance by the instructor per schedule class.  The class meets 2 times a week for 2.5 hours.

All of these duties occur in a Clay dust, residue environment. Precautionary dust masks are used (and required) during any mixing activity.

* * *

V.  PHYSICAL REQUIREMENTS: 100% of time

- Regular lifting of a minimum 50 lbs. to a maximum of 100 lbs. while bending, lifting and stacking

- Regular repetitive bending and lifting of up to 40 lbs.

- Regular walking and standing to supervise class and to use necessary equipment

- Regular sitting to throw and show examples of necessary processes partially in a crouching position

- Regular standing and bending to manipulate clay

**throughout teaching processes.**[12]

As is evident from the above, in comparison with the clay
thrower occupation, as that position is defined by the DOT,
Plaintiff's actual job is considerably more strenuous and
includes a set of essential duties that is substantially more
comprehensive.  As provided by the DOT, the duties of the clay
thrower position are essentially limited to the actual process of
molding clay materials into finished ceramic dishes.  Indeed, the
most strenuous duty listed on the DOT description appears to be
using the pottery wheel and removing finished pieces to dry.  The
DOT listing includes none of the maintenance, repair, and set-up
work which comprised a substantial part of Plaintiff's job, such
as unloading, moving, and shelving 50-pound bags of bulk clay and
glaze materials; preparing the 200-pound batches of clay prior
for use in each ceramics class; maintaining and repairing studio
equipment and tools; and recycling the large amounts of unused
clay materials.  Although LINA acknowledged that "lifting and
mixing supplies" were essential duties of Plaintiff's occupation,
the DOT entry upon which it relied simply does not reflect such
duties.[13]

---

[12]  See Rec. Doc. 11-4, A.R., p. 287-88.

[13]  See Rec. Doc. 11-4, A.R., p. 288.

Furthermore, the physical strength requirements and physical occupational demands associated with Plaintiff's actual job duties are incongruent with those of the "medium" level work reflected in the DOT listing.[14]   For instance, rather than lifting up to 50 pounds only up to one-third of his working time, as LINA's determination suggests, the evidence shows that Plaintiff's actual duties required him to lift a *minimum* of 50 pounds while bending, lifting, and stacking "100% of the time."[15] Similarly, while the DOT entry provided a set of physical demands which completely excluded stooping and crouching – activities which reportedly caused Plaintiff extreme pain – his actual job duties required him to crouch, bend over, and lift heavy amounts of weight *regularly*.[16]

These discrepancies are troubling, given LINA's knowledge that Plaintiff's claimed disability stemmed from a spinal condition.   On this record, and considering that LINA is a conflicted administrator, the Court concludes that LINA has

---

[14]   "Medium" strength work, as provided by the DOT, requires lifting up to 10 pounds constantly, 10-25 pounds frequently, and 25-50 pounds only occasionally.   See UNITED STATES DEPARTMENT OF LABOR, DICTIONARY OF OCCUPATIONAL TITLES, Appendix C, <u>available at</u> http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

[15]   See Rec. Doc. 11-4, A.R., p. 288.

[16]   Compare Rec. Doc. 11-4, A.R., p. 258 with Rec. Doc. 11-4, A.R., p. 288

abused its discretion in determining Plaintiff's occupational
duties, and in analyzing his claim with respect to these duties.
LINA was presented with evidence showing that Plaintiff was
performing a job with duties that were both more extensive and
more strenuous than the DOT entries upon which it relied.  The
physically demanding nature of these duties was documented not
only in the staff job description Plaintiff submitted in support
of his claim, but also in the medical forms and correspondence
his physicians submitted in support of both his initial claim for
disability benefits and his appeal.[17]  LINA ignored or

---

[17]  See, e.g., Rec. Doc. 11-3, A.R., p. 172 ("In addition, a
note from Loyola indicates the physical requirements of his job.
These requirements include regular lifting to a minimum of 50
pounds, maximum of 100 pounds while bending; regular repetitive
bending and lifting of up to 40 pounds; walking and standing to
supervise class and use equipment; regular sitting to throw and
show examples of necessary processes in a craftsman position; and
regular standing and bending to manipulate clay throughout the
teaching processes.  My feeling is he cannot regularly lift even
a minimum of 50 pounds.  He cannot repetitively bend and lift up
to 40 pounds.  He cannot walk and stand for long periods.  He
cannot sit and throw and show examples of necessary processes for
any extended periods of time because he cannot maintain the same
position for a long period of time.  In addition, regularly
standing for long periods and bending for long periods to
manipulate the clay throughout the teaching process is painful
and unbearable for him as well."); Rec. Doc. 11-4, A.R., p. 272
("It is impossible for him to perform his job in the Ceramics
Department.  He has great difficulty with lifting, stooping,
[and] pushing up objects greater than 10 lbs."); p. 273 ("He is
finding great difficulty getting through every day. He works as a
tenured professor at Loyola University in the ceramics
department. He is having great difficulty doing his job. He
cannot lift.  He cannot bend.  He cannot stand for long periods

disregarded this evidence, opting instead to analyze Plaintiff's claim for long-term disability benefits by referring to a DOT description which omitted most, if not all, of the very duties Plaintiff claimed he could not perform.  LINA has offered no explanation for this unwavering reliance on the DOT and has pointed to no evidence in the Administrative Record suggesting that these duties were in any way atypical of an Associate Ceramics Professor in a similar job setting in the general economy.  Under these facts, the Court finds that this determination amounts to an abuse of discretion.

### C.  Was LINA's Decision to Deny Benefits an Abuse of Discretion?

While the Court finds LINA's methodology for determining the material duties of Plaintiff's occupation problematic, Plaintiff's occupational duties were not the primary grounds for its decision to deny his claim.  Instead, LINA denied Plaintiff's claim for long-term disability benefits based on his purported failure to submit objective medical evidence demonstrating that he was unable to perform the material duties of his regular occupation.  Plaintiff contends that this determination amounts to an abuse of discretion in light of the evidence contained in

_____

of time."); p. 277 ("Nonetheless, my feeling is that it is impossible for him to him to do his job, which involves heavy lifting and bending . . .").

the administrative record.

### i. The Social Security Administration's Disability Determination

Plaintiff first urges the Court to consider that the Social Security Administration has determined that Plaintiff is disabled from performing *any* occupation, much less his own physically demanding occupation.  However, the administrative record contains no evidence of any such determination by the Social Security Administration, and the Court's review of LINA's determination is limited to the evidence in the administrative record.  See Estate of Bratton v. Nat'l Union Fire Ins. Co., 215 F.3d 516, 521 (5th Cir. 2000); see also Marrs v. Prudential Ins. Co. of Am., 444 F. App'x 75, 77-78 (5th Cir. 2011) (finding district court's consideration of the Social Security Administration's disability determination improper when that evidence was not contained in the Administrative Record).  Accordingly, the Court will give no consideration to the Social Security Administration's disability determination in assessing whether LINA abused its discretion.

### ii. The Medical Evidence in the Administrative Record

As previously mentioned, in its letter denying his claim, LINA found that the objective medical evidence presented did not show that Plaintiff was unable to perform his job as an associate

33

ceramics professor.  LINA first argues that its benefits determination should be upheld because the mere fact that Plaintiff has been *diagnosed* with degenerative disc disease does not in and of itself establish that Plaintiff is disabled.  In the abstract, the Court agrees with this contention.  See, e.g., Ned v. Hartford, No. 06-0686, 2007 WL 594902, at *9 (W.D. La. Feb. 16, 2007) (denying ERISA claim because statement of diagnosis "alone is insufficient to support a finding of disability [where it] contains no prognosis, no findings or comments regarding [a claimant's] ability or inability to engage in any work activities of her own or any other occupation, and no statement of any past or present disability."); Hamburg v. Life Ins. Co. of Am., No. 10-3071, 2011 WL 3841720, at *5 (E.D. La. Aug. 29, 2011) (agreeing that "a diagnosis of a medical condition alone does not always merit disability benefits").  Here, however, Plaintiff's claim does not rest solely on the fact that he has been diagnosed with degenerative disc disease.  Over the course of the claims process and his subsequent appeal, Plaintiff has submitted a substantial amount of evidence demonstrating his inability to perform his occupation as an associate ceramics professor.

For example, Plaintiff submitted the medical records and a physician's statement from Dr. Andrew Todd, the orthopedic

34

specialist who diagnosed Plaintiff's condition.  Dr. Todd
concluded that it was essentially "impossible for [Plaintiff] to
perform his job in the Ceramics Department" on account of the
severe back pain caused by his degenerative disc disease, which
he found to be "incapacitating and disabling."[18]  Dr. Todd's
reports further document Plaintiff's "severely decreased range of
motion of his lumbar spine," his difficulty going from a seated
to a standing position, his inability to sit or stand for
extended periods of time, and his inability to lift any
significant amount of weight.[19]  These conclusions were based on
five separate medical examinations, as well as Dr. Todd's
interpretation of objective medical evidence, including multiple
x-rays, MRI's, and CT discograms, each of which he concluded was
completely consistent with the levels of pain Plaintiff was
reporting.  Dr. Todd prescribed detailed functional limitations
regarding Plaintiff's job duties, including absolute restrictions
on climbing, crouching, crawling, or lifting anything over 10
pounds, as well as sitting, stooping, kneeling, walking, or
standing only up to 2.5 hours per day.

    Next, Plaintiff also submitted medical records and a

---

[18]   Rec. Doc. 11-4, A.R., p. 272; 276.

[19]   Rec. Doc. 11-4, A.R., p. 276.

physician's statement from Dr. Christopher Lege, who was his
primary care physician.   Dr. Lege first treated Plaintiff's back
pain approximately two years prior to the time he sought
disability benefits.   His office records document Plaintiff's
persistent and severe back pain, his "impaired gait" resulting
therefrom, and his back spasms.[20]   Based on his observations, and
his review of Plaintiff's medical records, he diagnosed Plaintiff
with both degenerative disc disease and COPD.   He further
concluded that Plaintiff could only perform a sedentary
occupation, and thus that he could not return to work in the
ceramics department.[21]   He concluded that Plaintiff could not
climb, balance, stoop, kneel, crouch, crawl, sit in the same
position, or stand.   He also noted that Plaintiff could only walk
or sit for up to 2.5 hours daily, and could not lift objects in
excess of 10 pounds.[22]

The administrative record also contains medical records and
a physician's statement from Dr. Charles Billings, an orthopedic
surgeon who examined Plaintiff after his claim was initially
denied.   Dr. Billings independently reviewed Plaintiff's medical

---

[20]   Rec. Doc. 11-3, A.R., p. 186-190.

[21]   Rec. Doc. 11-4, A.R., p. 269-70.

[22]   Rec. Doc. 11-4, A.R., p. 269-70.

records and ordered further diagnostic tests to be performed to assess Plaintiff's condition.  After reviewing this evidence, which he found to be consistent with Plaintiff's self-reported pain, he confirmed Plaintiff's previous diagnosis of degenerative disc disease and concluded that Plaintiff could perform only sedentary work.  He also specifically noted that Plaintiff could lift no more than 10 pounds, could not crouch or stoop, and could sit or stand for periods no longer than 2.5 hours.[23]

The administrative record also contains a medical opinion from Dr. Daniel Rovira, the physician who interpreted the results of the lumbar myelogram ordered by Dr. Billings.  Dr. Rovira found "broad-based protrusion or herniation of disc material" at the L5-S1 level and "multifactorial left-sided neural foraminal stenosis" at the L4-L5 level, which were consistent with the results of Plaintiff's previous discogram and MRI.[24] Additionally, Dr. Paul Jackson, who interpreted the results of the whole-body bone scan ordered by Dr. Billings, found evidence of degenerative change in the sacroiliac joints and the sternomanubrial joint, as reflected in records submitted in support of Plaintiff's claim.

---

[23]  Rec. Doc. 11-3, A.R., p. 174-75.

[24]  Rec. Doc. 11-3, A.R., p. 178-79.

Nonetheless, even though it admits to reviewing all of the foregoing evidence, LINA determined that Plaintiff had failed to submit objective medical evidence demonstrating an inability to perform the material duties of his job.  In this respect, the facts of this case mirror those of several other cases from this circuit in which courts have reviewed ERISA disability claims based on back pain stemming from spinal conditions.

In Schully v. Continental Casualty Co., 634 F. Supp. 2d 663, 665-68 (E.D. La. 2009), for example, an attorney who had been diagnosed with degenerative disc disease filed a claim for disability benefits based on his severe back pain.  In denying his claim, the plan administrator found that the claimant had failed to submit objective medical evidence to support his subjective complaints of pain or to establish the need for functional limitations that would prevent him from performing his job duties.  Id. at 671-75.  After exhausting his internal appeals, the claimant filed suit to challenge the administrator's determination.  Following a review of the evidence presented in the administrative record, the court found that the administrator abused its discretion in denying the claim.

The court explained that the administrator unreasonably refused to credit the claimant's subjective accounts of pain, where those accounts were supported by an "overwhelming" amount

38

of objective medical evidence, such as MRI's, cervical
myelograms, and CAT scans.  Id. at 686-88.  Furthermore, each of
the claimant's treating physicians found this medical evidence to
corroborate Plaintiff's reported pain levels and concluded that
his back pain prevented him from returning to work as an
attorney.  The administrator nonetheless "readily dismissed . . .
the numerous consistent findings of his treating physicians as
lacking support in objective medical evidence," based on the
opinions of its own physicians, none of whom had ever personally
examined the claimant or spoken with the treating physicians.
Id. at 684.  Accordingly, the court reversed the administrator's
decision and awarded the claimant disability benefits.  Id. at
687.  The Fifth Circuit subsequently affirmed the district
court's judgment.  380 F. App'x. 437 (5th Cir. 2010).

Similarly, in Burdett v. Unum Life Insurance Co. of America,
No. 06-6138, 2008 WL 4469094, at *1-*7 (E.D. La. Sep. 30, 2008),
a cytotechnologist filed a claim for disability benefits based on
chronic lower back pain stemming from a prior accident which left
her with herniated discs and spondylosis.  The plan administrator
denied the claim after determining that her claimed disability
was based entirely on self-reported symptoms.  The district court
reversed the plan administrator's determination, finding that
while the claimant's complaints of pain were based on her

39

subjective experience, these complaints were corroborated by a
substantial amount of objective medical evidence, including the
results of MRI's, EMG's, and lumbar myelograms.  Id. at *10-*11.
The claimant's accounts of pain were further substantiated by
medical opinions from her treating physicians, each of whom had
conducted several physical examinations and had prescribed
specific restrictions that prevented her from returning to work.
Id.  The Burdett court was troubled by the administrator's
decision to disregard the conclusions of the claimant's treating
physicians, and to rely exclusively on the opinions of its own
"in-house" physicians, none of whom had ever treated the claimant
in person.  Id. at *11.

Additionally, in Schexnayder v. CF Industries Long Term
Disability Plan, 553 F. Supp. 2d 658, 660 (M.D. La. 2008), aff'd
in part, rev'd in part on other grounds, 600 F.3d 465 (5th Cir.
2010), a chemical operator sought disability benefits under his
employer's ERISA plan for a back injury that prevented him from
returning to work.  After providing the employee disability
benefits for two years, the plan administrator terminated
payments, relying on the opinions of its own physicians that his
"complaints of pain [were] subjective and 'not consistent' with
the objective findings." Id. at 666.  The district court
disagreed, reversed the administrator's determination, and

reinstated benefits.  The court found that the evidence in the administrative record, including diagnostic test results, confirmed the claimant's subjective complaints of pain, and that the administrator had abused its discretion by discounting the plaintiff's pain and refusing to credit the objective evidence corroborating his disability, including the opinions of his treating physicians.  Id. at 667.

Finally, in Audino v. Raytheon Co. Short Term Disability Plan, 129 F. App'x 882, 885 (5th Cir. 2005), the Fifth Circuit was troubled by an administrator's failure to accord weight to a claimant's consistent complaints of pain, especially where those complaints were documented in medical records well before the claimant sought disability benefits, there was objective medical corroborating her complaints, and little indication that she was exaggerating her pain levels once she sought disability benefits. The court further explained that "pain cannot always be objectively quantified" and that it had previously "faulted an administrator for 'focu[sing] on [ ] tests, rather than the pain and its effect.'" Id. (quoting Lain, 279 F.3d at 347).

Here, like the plan administrators in the foregoing cases, LINA readily discounted Plaintiff's complaints of subjective pain, even where those accounts were corroborated by his physicians and consistent with essentially all the objective

41

medical evidence he submitted in support of his claim.   An
administrator may not arbitrarily discount a claimant's accounts
of pain merely because they are subjective – particularly where
the plan itself does not restrict what evidence may be used to
demonstrate disability, as is the case here.[25]   See, e.g., Glenn
v. MetLife, 461 F.3d 660, 673 (6th Cir. 2006), aff'd 554 U.S. 105
(2008) (noting that the plan did "not say that self-reported or
'subjective' factors should be accorded less significance than
other indicators" and finding abuse of discretion where
administrator denied disability claim on basis of lack of
supportive medical documentation); Mitchell v. Eastman Kodak Co.,
113 F.3d 433, 442-43 (3d Cir. 1997)(arbitrary and capricious for
the plan administrator to require the claimant to submit
"clinical evidence" of the "etiology" of his allegedly disabling
symptoms when the terms of the plan did not impose such a
requirement); Adams v. Metro. Life Ins. Co., 549 F. Supp. 2d 775,
793 (M.D. La. 2007) (where administrator could point to no plan
provision "limiting the record . . . to objective data,"
administrator abused its discretion in failing to consider
claimant's subjective accounts of pain and assessments by

_____

[25]   The plan only requires a claimant to provide
"[s]atisfactory proof of disability" to demonstrate eligibility
for benefits.  See Rec. Doc. 11-2, A.R., p. 89.

treating physicians).

Furthermore, Plaintiff has undergone numerous MRI's, x-rays, a whole-body nuclear bone scan, a lumbar myelogram, and a discogram, each of which confirmed the existence of his degenerative disc disease and substantiated his subjective accounts of disabling pain.  The record also shows that Plaintiff had reported back pain years prior to the time that he sought disability benefits, and that he consistently attempted to continue working until his pain became unmanageable.   Although the record contains essentially no basis for challenging these accounts or the medical records corroborating them, LINA failed to accord this evidence any weight.  On this record, the Court finds this failure amounts to an abuse of discretion.

### iii.  *Other Evidence LINA Failed to Consider*

LINA also failed to consider other objective evidence corroborating his inability to perform his required job duties. Plaintiff submitted a letter composed by Dr. Simeon Hunter, the chair of the Visual Arts Department at Loyola University, in support of his administrative appeal.  In the letter, Dr. Hunter recounts the progression of Plaintiff's disability, his efforts to continue teaching in spite of his pain, and his evident disappointment that his health required him to abandon a job that he seemingly loved.  As Dr. Hunter explained:

43

Steve Rucker has been the studio ceramics professor in
the Department of Visual Arts for many years.  Our
respect for him and for his work is unquestionable.

Tragically, he has a progressive medical condition,
which we have been aware of for some time. Since he is
a valued employee, we have tried to help him work
around his physical limitations as far as possible --
and perhaps a little further.

In the Fall of 2009, I made an agreement with the Dean
of the College of Music and Fine Arts to provided Steve
with a full-time assistant who was able to meet the
physical demands of the job and who was also able to
oversee teaching aspects of the role when Steve felt
unable to do so. Steve was determined to try to
continue his teaching role at the university.  We knew
that this would be problematic but we wanted to help
him try.

Very soon after the semester began it became clear that
Professor Rucker could not in fact sit or stand for
anything close to the three hours required for him to
oversee his class -- even with someone else doing all
the heavy work for him.  He realized that in order to
manage his pain enough to be present he had to medicate
to a point which rendered him unable to teach.

After a brief period he admitted that he was not able
to do what he had hoped and we agreed that his
assistant would step forward and take over as much of
his role as necessary.  Shortly after, Steve Jet me
know that he was going to attend only the first 20
minutes or so of his 3 hour class in order to let his
students know that, much as he wished to be able to
help them, his health obliged him to place them in the
capable hands of his assistant.  In many cases these
were students who Professor Rucker had worked with over
a period of as much as three consecutive years -
students he felt responsible for and did not wish to
abandon.

It seemed only reasonable to allow Steve the option of
working when he wished to try, even when we were aware

**that this could not be sustained . . .**[26]

Here, the administrative record reveals that LINA gave no consideration to this evidence, even though it provides at least some degree of objective corroboration for Plaintiff's claims that he could not perform his occupational duties. Other courts have found it arbitrary and capricious for an administrator to disregard a third party's observations confirming a claimant's disability when analyzing a claim. Rekstad v. U.S. Bancorp, 451 F.3d 1114, 1121 (10th Cir. 2006); see also McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161 (6th Cir. 2003) (valuing third party observations as evidence of disability); Burdett, 2008 WL 4469094, at *14 (crediting letter from claimant's employer as further evidence of disability). While LINA is certainly under no obligation to give this evidence dispositive weight, its failure to even acknowledge it is unreasonable and further indicates that it abused its discretion.

The Court is also troubled by LINA's cursory dismissal of the observations and conclusions of Plaintiff's treating physicians, each of whom opined that Plaintiff's back condition prevented him from performing his occupation. LINA urges that the law does not require it to "blindly" defer to the "subjective

---

[26] See Rec. Doc. 11-3, A.R., p. 169-70.

assessments" of Plaintiff's treating physicians, where those
physicians are in turn based on the claimant's subjective
accounts of pain.  It is true that the Fifth Circuit has upheld
an administrator's decision not to credit a treating physician's
"generalized statement" that a claimant is totally disabled, when
that statement is unsupported by any objective medical evidence.
See, e.g., Simoneaux v. Cont'l Cas. Co., 101 F. App'x. 10, 12
(5th Cir. 2004) ("Continental was neither irrational nor
arbitrary in failing to give overriding weight to the treating
physician's statement that [the claimant] was totally disabled, a
generalized statement not supported by objective medical
findings."); Gooden v. Provident Life & Accident Insurance Co.,
250 F.3d 329, 333-34 (5th Cir. 2001)(letter from treating
physician stating that patient was disabled, unaccompanied by
medical evidence, did not undermine Plan Administrator's decision
finding no disability).

    Here, however, each of these medical professionals
independently examined Plaintiff, and having reviewed the results
of various diagnostic tests and having observed his condition
over an extended period of time, determined that Plaintiff's
subjective complaints were entirely consistent with the objective
medical evidence findings.  Based on the totality of the medical
evidence before them, they prescribed specific limitations and

restrictions which demonstrated that he was unable to perform his job.

Furthermore, even if his treating physicians did consider Plaintiff's subjective complaints of pain when evaluating his ability to work, "a doctor's assessment of pain is not insignificant medical testimony."  See Pollini v. Raytheon Disability Employee Trust, 54 F. Supp. 2d 54, 59-60 (D. Mass. 1999); see also Lee v. BellSouth Telecommunications, Inc., 318 F. App'x 829, 837 (11th Cir. 2009) (explaining that a physician's "consistent observations of physical manifestations of [a claimant's] condition do in fact constitute objective medical evidence").  As such, the Court finds it unreasonable for LINA to have ignored the assessment of Plaintiff's pain made by several trained medical professionals.  While LINA was certainly under no duty to give preference to the opinions of Plaintiff's treating physicians, the corollary to this rule is that a plan administrator "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).

In refusing to credit any of the above evidence, LINA opted instead to adopt, in total, the opinion of its own physician consultant, Dr. Ursone, that the functional limitations

Plaintiff's treating physicians prescribed were unsupported by "documentation of physical exam findings or other clinical abnormalities" that supported a functional impairment.  The Court finds this reliance problematic in two respects.  First, despite having no contact with any of Plaintiff's treating physicians, Dr. Ursone's report summarily discounts the conclusions of each of these three medical professionals that Plaintiff was unable to work.  Neither LINA nor Dr. Ursone provide a reasoned, non-conclusory basis for refusing these conclusions.  Second, the Court finds it significant that Dr. Ursone never personally examined the Plaintiff and based his opinion entirely on a paper review of Plaintiff's medical records.

The Court acknowledges that the Fifth Circuit has rejected the notion that a plan administrator necessarily abuses its discretion by relying on the opinion of a consultant physician who has only reviewed a claimant's medical records.  See, e.g., Anderson, 619 F.3d at 515 ("That the independent experts reviewed Anderson's records but did not examine him personally also does not invalidate or call into question their conclusions.").  Nevertheless, as numerous courts have recognized, this fact may still be considered in assessing the overall reasonableness of the administrator's decision-making process.  See Elliot v. Metro. Life Ins. Co., 473 F.3d 613, 621 (6th Cir. 2006) (noting

48

that a plan administrator's "decision to conduct a file-only review – especially where the right to conduct a physical examination is specifically reserved in the plan – may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination")(internal quotations omitted); <u>Winkler v. Met. Life Ins. Co.</u>, 170 F. App'x 167 (2d Cir. 2006) (vacating denial as arbitrary where it was based "entirely on the opinions of three independent consultants who never personally examined [plaintiff], while discounting the opinions" of the treating physicians); <u>see also</u> <u>Adams</u>, 549 F. Supp. 2d at 790 (where a "case involves subjective accounts, the fact that only a file review was conducted is relevant").  While this fact alone is by no means determinative, the Court attaches some significance to the fact that LINA denied Plaintiff's claim based solely on a review of his medical records, especially considering that LINA specifically reserved the right to physically examine Plaintiff at any time during the claims process.[27]

Second, and perhaps more significantly, neither LINA nor Dr. Ursone points to any evidence in the administrative record that refutes the conclusions of Plaintiff's treating physicians that

---

[27]   <u>See</u> Rec. Doc. 11-2, A.R., p. 96 ("The Insurance Company, at its expense, will have the right to examine any person for whom a claim is pending as often as it may reasonably require.").

his condition prevented him from being able to perform his job. Nor do they contend that Plaintiff has been improperly diagnosed with degenerative disc disease, or that his subjective symptoms are inconsistent with this diagnosis. Instead, as explained above, LINA determined, based on Dr. Ursone's opinion, that the specific restrictions and limitations prescribed by Dr. Todd, Dr. Lege, and Dr. Billings were not supported by the medical evidence in Plaintiff's file. However, logically speaking, a conclusion that the specific limitations are not supported by medical evidence does not answer the question of whether a claimant could not perform the duties of his occupation, which was the ultimate question presented by Plaintiff's claim.

Indeed, the record shows that neither LINA nor Dr. Ursone ever specifically analyzed how Plaintiff's condition affected his ability to engage in any of the specific duties required by his job, which is a practice courts have found problematic. See Audino, 129 F. App'x at 885 (finding abuse of discretion, in part, because administrator "concluded that the evidence did not show an inability to do her job functions without analyzing the effect that her conditions would have on her ability to perform her specific job requirements"); Elliott v. Metro. Life Ins. Co., 473 F.3d 613, 619 (6th Cir. 2006) (administrator abused its discretion in denying claimant benefits "based on evidence that

50

simply is not analyzed in relation to her ability to perform her occupation").

As such, this is not, as LINA contends, a case involving a "battle of the experts," where a reviewing physician reaches a different medical conclusion based on the objective medical evidence presented, or where the administrative record contains evidence contradicting the diagnosis or conclusions of a treating physician.  In a similar case, for example, a disability plan participant submitted a claim for benefits, together with her treating physician's statement that the claimant was disabled due to degenerative disc disease.  See Roig v. The Limited Long-Term Disability Program, 275 F.3d 45, at *1 (5th Cir. 2001).  The administrator denied the claim, finding that the claimant failed to establish that she satisfied the plan's disability definition.  Id. at *2-*3.  The claimant appealed, and the administrator upheld its prior denial.  The district court reversed the administrator's decision, and the Fifth Circuit affirmed its judgment that the administrator's decision was not supported by substantial evidence.  Id. at *3-*4.  The Court explained that because the plan administrator had not interviewed the claimant or ordered an independent medical examination, it had no evidence to refute the conclusion of the treating physician.  Accordingly, it held that there was no substantial evidence to support the

finding that the claimant did not meet the plan's disability definition.  Id.; see also Martin v. SBC Disability Income Plan, 257 F. App'x 751, 754-55 (5th Cir. 2007)(holding that a plan administrator abused its discretion in denying a claim for disability benefits based on lack of "objective clinical findings" showing inability to perform job duties, where neither the administrator nor its reviewing physician disputed the diagnosis of the claimant's treating physician and could point to no evidence contradicting the treating physician's conclusion that the claimant could not perform the duties of his occupation); Skretvedt v. E.I. DuPont de Nemours and Co., 268 F.3d 167, 170 (3d Cir. 2001)(administrator's decision was arbitrary and capricious when it could "point to no truly conflicting medical evidence" contradicting the treating physician's conclusions); Kelly v. Reliance Standard Life Ins. Co., 09-2478, 2011 WL 6756932, at *8 (D.N.J. Dec. 22, 2011) ("While it is acceptable for the administrator to credit the contrary evidence of a non-treating physician, where a non-treating physician's opinion simply cites to an absence of information [supporting a treating physician's prescribed limitations,] it does not serve to refute the treating physician's conclusions, and in and of itself is not a reasonable explanation for denying benefits.").

Here, similarly, the only medical professionals who have expressed any opinion as to Plaintiff's ability to work have concluded that his degenerative disc disease causes him considerable pain, prevents him from working, and is not currently amenable to surgical treatment.  There is essentially no medical evidence to the contrary.  As such, just as in the foregoing cases, the Court finds LINA's determination that Plaintiff failed to show that he was disabled under the terms of the policy is not supported by substantial evidence.

### iv.  Other Considerations

The Court also finds LINA's determination problematic in other respects.  First, the Court is somewhat troubled by LINA's failure to explain why the substantial amount of medical evidence submitted in support of Plaintiff's claim was insufficient.  In its trial brief, LINA suggests that it specifically informed Plaintiff of the exact type of evidence it would deem sufficient to satisfy the burden of providing "satisfactory proof of disability."[28]  However, the Court finds that such was not the case.

---

[28] See LINA's Trial Brief, Rec. Doc. 13, p. 23 ("In denying the Plaintiff's original claim for LTD benefits, LINA provided the Plaintiff with not only a detailed explanation as to why his claim was being denied, but also with a list of suggested medical evidence that he could submit to assist LINA's review of the claim on appeal.").

As previously discussed, in its initial denial letter, LINA determined that the medical evidence did not support the conclusion that Plaintiff was unable to perform his occupation. Although the letter referenced a lack of lower extremity strength scales and the absence of range of motion measurements, LINA did not sufficiently explain to Plaintiff that his claim was being denied because of a lack of such figures.  Instead, it provided Plaintiff with an extensive list of additional evidence that he should submit if he wished to appeal the determination – a list which notably did not include "range of motion figures" or "lower extremity strength scales."[29]  The evidence LINA suggested would be helpful was:  (1) copies of diagnostic test results, such as CT scans, myelograms, x-rays, neurological exams, functional capacity evaluations, etc.; (2) copies of treatment notes, hospital records, office notes, physical therapy notes, and/or consultation reports; (3) a discussion by his treating physician(s) of the medical evidence pointing to a condition

─────────────

[29]  Additionally, contrary to LINA's determination, the administrative record does show that Plaintiff submitted lower extremity strength scales and range of motion figures.  LINA's denial letter seems to acknowledge this fact, but misstates that such figures were not provided.  See Rec. Doc. 11-2, A.R., p. 128-29 ("Strength on right and left hamstrings and gluts were 4/5. You were able to flex fingertips to knees; extension 50 percent limited. Right and left side bending fingertips 2" above knee joint. Right and left hamstring flexibility - 35 degrees.").

which prevents him from performing his job; and (4) a discussion by his treating physician(s) describing his current and future treatment plans and goals.[30]  Plaintiff, understandably confused by this request, attempted to provide LINA with the type of evidence it requested by providing additional diagnostic test results (a full-body bone scan; a lumbar myelogram; and an additional MRI), additional treatment notes and medical records, and a disability statement from Dr. Charles Billings, an orthopedic surgeon.  He also composed a letter to LINA in which he expressed his willingness to provide additional information regarding his disability, if necessary.[31]

Nonetheless, even though the evidence submitted was of the very form that LINA requested, LINA now argues that this evidence is not the type of "clinical evidence" which is required to objectively establish his disability.  The fact that LINA requested the exact evidence it later deemed insufficient to demonstrate Plaintiff's disability is, in the Court's view, yet another factor suggesting  that LINA abused its discretion in denying his claim.  See Archer v. United Tech. Corp., No. 07-1485, 2009 WL 561375, at *7 (N.D. Tex. Mar. 3, 2009) (finding

---

[30]   Rec. Doc. 11-2, A.R., p. 130.

[31]   Rec. Doc. 11-3, A.R., p. 169-70.

"the fact that objective evidence was asked for and then seemingly disregarded when provided" indicated that the administrator abused its discretion in denying the claim); Servat v. American Heritage Life Ins. Co., No. 04-2928, 2007 WL 2480342, at *16 (E.D. La. Aug. 28, 2007) (finding abuse of discretion, in part, because denial letter did not adequately explain that claim was being denied for lack of "objective evidence" of disability, where the policy did not include an "objective evidence" requirement, and administrator failed to specify the type of evidence it would deem appropriate to establish disability); see also Pralutsky v. Metro. Life Ins. Co., 435 F.3d 833, 839 (8th Cir. 2006) (noting that "it may well be unreasonable for an administrator to expect a claimant to provide 'objective evidence' if the administrator does not provide an adequate explanation of the information sought").

Even Plaintiff's orthopedic specialist, Dr. Todd, expressed confusion at this seemingly contradictory nature of LINA's request while Plaintiff's appeal was pending.[32]  Even more

---

[32]  See Rec. Doc. 11-3, A.R., p. 172 ("He provided me with a letter today from CIGNA group insurance indicating that they have turned him down for disability.  They are asking for further information including copies of diagnostic test results, treatment notes, medical evidence discussion, and current and future treatment plans.  This is somewhat strange to me since all of these things have been outlined in the previous notes and have been rather well documented.").

frustratingly, in the same letter informing him that his appeal
had been denied based on the insufficiency of the evidence
submitted, LINA *again* provided Plaintiff with a broad, non-
specific list of evidence that should be submitted in support of
a second appeal.[33]  Given its failure to simply clarify the type
of evidence it would require to approve his claim, and
considering the otherwise conclusory nature of the denial
letters, the Court finds this is yet another factor suggesting
that LINA abused its discretion.

Second, the Court gives at least some weight to LINA's
inherent conflict of interest. As noted above, the Supreme Court
has explained that there is an inherent conflict of interest
where a company acts as both insurer and plan administrator
because "every dollar provided in benefits is a dollar spent by .
. . the employer; and every dollar saved . . . is a dollar in
[the employer's] pocket." Glenn, 554 U.S. at 112 (quoting Bruch,
828 F.2d at 144).  Here, the only trained physician who found
that there was insufficient evidence to conclude that Plaintiff

---

[33]  See Rec. Doc. 11-2, A.R., p. 144  ("You may also submit
additional information. Additional information may include, but
is not limited to: medical records from your doctor and/or
hospital, test result reports, therapy notes, etc . . . . You may
also wish to have your doctor(s) provide some or all of the
following:  x-ray, cbc, ESR, MRI, CT, Myelogram, EMG, SEP, ROM,
MMT, etc.").

could not perform his occupational duties was LINA's physician consultant, Dr. Ursone.  Neither he, nor LINA, ever sufficiently explain their conclusions that Plaintiff had offered no objective evidence of his disability, or why the evidence he submitted – again, at LINA's suggestion – was insufficient.  The Court finds, therefore, that LINA's inherent conflict of interest deserves some weight in assessing whether it abused its discretion in denying Plaintiff's claim.

### D.  The Appropriate Remedy

In conclusion, having throughly reviewed the administrative record, the Court finds that even under the deferential arbitrary and capricious standard, LINA's denial of Plaintiff's claim for long-term disability benefits must be rejected because it is unsupported by substantial evidence.  The medical evidence submitted clearly supports Plaintiff's claim that he was unable to perform all the material duties of his regular occupation on account of the pain caused by his degenerative disc disease. LINA, having never examined the Plaintiff and relying solely on a "paper" review of his medical records, refused to credit Plaintiff's consistent subjective complaints of pain, the objective medical evidence corroborating that pain, and the consistent observations and clinical assessments of the physicians most familiar with his condition.  Furthermore,

despite the extensive medical documentation submitted, LINA determined that the specific restrictions and limitations prescribed were unsupported by medical evidence, without ever sufficiently explaining why it the evidence submitted was inadequate, without considering the evidence presented in relation to the requirements of Plaintiff's actual job duties, and without any independent evidence to refute the Plaintiff's medical evidence.

"If an administrator has made a decision denying benefits when the record does not support such a denial, the court may, upon finding an abuse of discretion on the administrator's part, award the amount due on the claim and attorney's fees." Estate of Bratton, 215 F.3d at 521 (citing Vega, 188 F.3d at 302). Here, for all the reasons expressed above, the Court finds that LINA abused its discretion in denying Plaintiff's claim for long-term disability benefits, based on the evidence it had before it. Accordingly, LINA's determination will be reversed and Plaintiff will be awarded the disability benefits due under the policy.

Because the parties' submissions do not provide sufficient information for the Court to determine the exact dollar amount of benefits owed, however, additional filings will be required in order to fully resolve this matter. Accordingly, the parties are directed to confer and, if possible, file a joint submission, on

or before April 15, 2012, outlining the amount of unpaid
benefits.  If the parties are unable to agree on the appropriate
figure, each shall submit a proposed calculation, and a short
supporting memorandum of not more than eight (8) pages, on or
before April 15, 2012.

**E.   Prejudgment Interest**

Plaintiff also seeks an award of prejudgment interest on his
disability benefits.  Although ERISA's attorney fee provision is
silent on the issue, a district court has discretion to award
prejudgment interest when awarding a claimant ERISA benefits.
Hansen v. Continental Ins. Co., 940 F.2d 971, 984 (5th Cir.
1991).  Indeed, as the Fifth Circuit has recognized, such awards
further the purposes of ERISA by "encouraging plan providers to
settle disputes quickly and fairly, thereby avoiding the expense
and difficulty of federal litigation."   Id. at 984 n.11.

When awarding prejudgment interest on an ERISA claim, it is
appropriate for the court to look to state law for guidance as to
the appropriate rate. Id. at 983-84.  Nevertheless, the state law
rate is not binding and it remains within the Court's discretion
to select an equitable rate of prejudgment interest. Id. (citing
Dallas-Fort Worth Reg. Airport Bd. v. Combustion Equip. Assocs.,
Inc., 623 F.2d 1032 (5th Cir. 1980)).

Looking to Louisiana law, which is the law that governed

60

Plaintiff's employment, the Court will award Plaintiff
prejudgment interest at 5.5% per annum, the applicable rate in
effect on December 3, 2009, which is the date on which LINA
denied his claim for disability benefits, and continuing through
the date of final judgment.  See La. R.S. 13:4202.

    **F.   Attorney's Fees and Costs**

    Finally, Plaintiff seeks an award of attorney's fees and
costs pursuant to ERISA's attorney fee provision, 29 U.S.C. §
1132(g)(1).  In Iron Workers Local No. 272 v. Bowen, 624 F.2d
1255, 1266 (5th Cir. 1980), the Fifth Circuit laid out five
factors district courts should consider in determining the
propriety of an ERISA fee award:  "(1) the degree of the opposing
parties' culpability or bad faith; (2) the ability of the
opposing parties to satisfy an award of attorneys' fees; (3)
whether an award of attorneys' fees against the opposing parties
would deter other persons acting under similar circumstances; (4)
whether the parties requesting attorneys' fees sought to benefit
all participants and beneficiaries of an ERISA plan or to resolve
a significant legal question regarding ERISA itself; and (5) the
relative merits of the parties' positions."

    Here, applying the Bowen factors to the facts of the instant
case, the Court finds that a fee award is appropriate.  As to the
first factor, the Court finds that LINA improperly denied

Plaintiff disability benefits, made little attempt to actively investigate his claim, and discounted the bulk of the evidence confirming his disability without any basis for doing so.  It also failed to adequately explain why the evidence Plaintiff offered was insufficient, or what type of evidence it would require to approve his claim.  See Servat, 2007 WL 2480342, at *21 (finding Bowen factors supported an award of attorney's fees where the administrator failed to explain its reason for denying the claim and the type of information required to satisfy the plan's disability definition).  Accordingly, the Court finds this factor weighs heavily in favor of awarding attorney's fees.

With respect to the second Bowen factor, LINA is one of the largest long-term disability insurance companies in the nation, and there is no evidence that it could not satisfy an award of attorney's fees.  The third factor also weighs in favor of imposing a fee award, in that it will discourage LINA and other plan administrators from repeating the same problematic behavior and practices described herein when processing future disability claims.  Bowen factor four weighs in favor of LINA, however, as Plaintiff's claim does not purport to benefit any other plan beneficiaries or to resolve a significant legal issue.  Finally, considering the degree of success attained by Plaintiff, the Court finds that the merits of Plaintiff's position in this case

clearly outweigh LINA's.  Accordingly, Plaintiff's request for an award of fees and costs is granted.

Within 30 days of the entry of final judgment, Plaintiff's counsel shall file a motion for attorney's fees and costs, together with an accounting and brief memorandum supporting the propriety of the amounts requested.  LINA shall submit any opposition within fifteen (15) working days from the date Plaintiff's motion is submitted.

### CONCLUSION

Accordingly, for all the reasons expressed above, **IT IS ORDERED** that Plaintiff's Motion for Judgment on the Administrative Record **(Rec. Doc. 14)** is **GRANTED**.

**IT IS FURTHER ORDERED** that the parties shall confer, and if possible, file a joint submission, on or before April 15, 2012, outlining the amount of unpaid benefits due under the policy, together with interest at the rate of 5.5% per annum.  Interest shall accrue from the date of December 3, 2009 through the date of final judgment.  If the parties are unable to agree on the appropriate figure, each shall submit a proposed calculation, and a short supporting memorandum of not more than eight (8) pages, on or before April 15, 2012.

**IT IS FURTHER ORDERED** that, within 30 days of the entry of final judgment,  Plaintiff's counsel shall file a motion for

attorney's fees and costs, together with an accounting and brief memorandum supporting the propriety of the amounts requested. LINA shall submit any opposition within fifteen (15) working days from the date Plaintiff's motion is submitted.

New Orleans, Louisiana this 20th day of March, 2012.

_____
CARL J. BARBIER
UNITED STATES DISTRICT COURT